UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| EXTENET SYSTEMS, INC., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| THE CITY OF CAMBRIDGE, | * | |
| MASSACHUSETTS; CITY OF | * | |
| CAMBRIDGE POLE AND CONDUIT | * | Civil Action No. 19-cv-11836-ADB |
| COMMISSION, and NICOLE MURATI | * | |
| FERRER, STEPHEN LENKAUSKAS, and | * | |
| TERRENCE JAMES SHEA, each in their | * | |
| official capacity as members of the City of | * | |
| Cambridge Pole and Conduit Commission, | * | |
| | * | |
| Defendants. | * | |
| | * | |

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS**

BURROUGHS, D.J.

Plaintiff ExteNet Systems, Inc. ("ExteNet") alleges that the City of Cambridge,

Massachusetts ("Cambridge"), City of Cambridge Pole and Conduit Commission ("P&C

Commission"), and Nicole Murati Ferrer, Stephen Lenkauskas, and Terrence James Shea, each

in their official capacity as members of the P&C Commission, (collectively "Defendants")

violated the Telecommunications Act of 1996 ("TCA") by denying ExteNet's applications to

install small wireless facilities.  [ECF No. 20 ("Am. Compl.")].  ExteNet claims that (1) the P&C

Commission's denials of its applications were improper because it should have received timely

notice that its applications were incomplete, (2) the denials have effectively prohibited the

provision of wireless services, and (3) the denials unreasonably discriminate against Plaintiff in

violation of 47 U.S.C. §§ 332(c)(7)(B)(i)(II), 332(c)(7)(B)(i)(I), 332(c)(7)(B)(ii), 253(a), 47

C.F.R. § 1.6003, and various orders from the Federal Communications Commission ("FCC").

See [Am. Compl.].  ExteNet also brings a facial challenge against Cambridge's Policy Regarding

Small Cell Wireless Installations on Public Ways ("Small Cell Wireless Policy" or "Policy"),

arguing that the TCA preempts the Policy.  See [id.].  Currently before the Court is Defendants'

motion to dismiss.  [ECF No. 35].  For the reasons stated herein, the motion, [ECF No. 35], is

GRANTED.

## I.      BACKGROUND

### A.      Factual Background

The following facts are drawn from ExteNet's amended complaint, [Am. Compl.], and

viewed in the light most favorable to ExteNet.  Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87,

90 (1st Cir. 2014) (citation omitted).  "[The Court] may augment these facts and inferences with

data points gleaned from documents incorporated by reference into the complaint, matters of

public record, and facts susceptible to judicial notice."  Grajales v. P.R. Ports Auth., 682 F.3d 40,

44 (1st Cir. 2012) (quoting Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011)).

ExteNet is a "wholesale, facilities-based telecommunications services" provider that

operates in Massachusetts.  [Am. Compl. ¶¶ 28–29].  Wireless service providers, such as

Verizon, AT&T, and Sprint, pay ExteNet to use its fiber optic cables and support equipment

network to provide wireless coverage.  [Id. ¶¶ 31–32].  Currently, ExteNet has a contract with

AT&T to install five Small Wireless Facilities[1] in Cambridge.  [Id. ¶ 40–41].  Under the contract,

---

[1] The FCC defines Small Wireless Facilities as facilities that meet the following conditions:

    (1) The facilities—
            (i) are mounted on structures 50 feet or less in height including their
            antennas as defined in section 1.1320(d), or

ExteNet is responsible for obtaining the permits to install the Small Wireless Facilities, while AT&T is responsible for providing power and the necessary fiber and data.  [Id. ¶¶ 44–45]. ExteNet plans to install these Small Wireless Facilities on several Cambridge streetlight poles, which would require removing and replacing the existing structures.  [Id. ¶¶ 47–48].

ExteNet submitted its first application under the contract to the P&C Commission on April 3, 2019; the remaining four applications were submitted on April 4, 2019.  [Am. Compl. ¶¶ 38–40].  The P&C Commission did not request additional information and did not notify ExteNet regarding whether its applications were complete.  [Id. ¶ 54].

At the time of ExteNet's application, Defendants had a Pole and Conduit Siting Policy, adopted in 2000, which required applicants working on a proposed project with other companies to designate a lead company for the application.  [ECF No. 17-13 at 7].  The lead company would have responsibility for coordinating the applications, permitting, constructions, wiring,

---

(ii) are mounted on structures no more than 10 percent taller than other adjacent structures, or
(iii) do not extend existing structures on which they are located to a height of more than 50 feet or by more than 10 percent, whichever is greater;
(2) Each antenna associated with the deployment, excluding associated antenna equipment (as defined in the definition of antenna in section 1.1320(d)), is no more than three cubic feet in volume;
(3) All other wireless equipment associated with the structure, including the wireless equipment associated with the antenna and any pre-existing associated equipment on the structure, is no more than 28 cubic feet in volume;
(4) The facilities do not require antenna structure registration under part 17 of this chapter;
(5) The facilities are not located on Tribal lands, as defined under 36 CFR 800.16(x); and
(6) The facilities do not result in human exposure to radiofrequency radiation in excess of the applicable safety standards specified in section 1.1307(b).

In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment; Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment, WT 17-29, WC 17-84, FCC 18-133, ¶ 13 (Sept. 26, 2018) ("2018 Declaratory Order").

and operation and would act as the P&C Commission's point of contact.  [Id.].  On May 16,

2019, the P&C Commission held a hearing on ExteNet's applications.  [Am. Compl. ¶ 59].

Additionally, the P&C Commission provided notice to ExteNet of and held a hearing on an

initial draft of its Small Cell Wireless Policy, which if adopted would provide further guidance

for applications pertaining to projects involving multiple companies, like ExteNet's.  [Id. ¶¶ 59–

61].  The P&C Commission informed ExteNet that it needed more time to review its applications

in light of the potential new rules.  [Id. ¶ 62].  ExteNet agreed to a tolling agreement that gave

the P&C Commission until July 30, 2019 to make a final determination on its applications and

allowed ExteNet to submit comments on the proposed policy during the rulemaking process.  [Id.

¶ 63].  ExteNet submitted extensive written comments and participated in subsequent public

hearings to help shape the Small Cell Wireless Policy.  [Id. ¶¶ 65–70].

On June 10, 2019, Defendants held a final public hearing regarding the Policy and

subsequently released and adopted their Small Cell Wireless Policy.  [Am. Compl. ¶¶ 71–73].

The P&C Commission then denied ExteNet's applications on July 30, 2019, in part because the

applications failed to specify how ExteNet intended to supply power and "fiber/data" to the

Small Wireless Facilities, [id. ¶ 92], and in part because the applications violated the newly

implemented Small Cell Wireless Policy and Defendants' Siting Policy, [ECF No. 17-7 at 6].

ExteNet declined to toll the application review deadline by an additional month, which would

have allowed AT&T to file a supplemental application demonstrating how it would power and

provide data to the Small Wireless Facilities in question.  [Id.].

### B.    Procedural Background

ExteNet filed its initial complaint against Defendants on August 28, 2019, claiming that

the Defendants' denials of its applications were improper under 47 U.S.C. § 332(c)(7), § 253(a),

and corresponding FCC guidance.  [ECF No. 1].  After Defendants moved to dismiss the initial

complaint, [ECF No. 17], ExteNet amended the complaint on February 11, 2020, [Am. Compl.].

Defendants moved to dismiss the amended complaint on March 17, 2020, [ECF No. 35], and

ExteNet opposed, [ECF No. 37].

## II.    LEGAL STANDARD

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept as true all

well-pleaded facts, analyze those facts in the light most favorable to the plaintiff, and draw all

reasonable factual inferences in favor of the plaintiff.  See Gilbert v. City of Chicopee, 915 F.3d

74, 80 (1st Cir. 2019).  "[D]etailed factual allegations" are not required, but the complaint must

set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555

(2007), and must contain "factual allegations, either direct or inferential, respecting each material

element necessary to sustain recovery under some actionable legal theory," Gagliardi v. Sullivan,

513 F.3d 301, 305 (1st Cir. 2008) (quoting Centro Médico del Turabo, Inc. v. Feliciano de

Melecio, 406 F.3d 1, 6 (1st Cir. 2005)).  The alleged facts must be sufficient to "state a claim to

relief that is plausible on its face."  Twombly, 550 U.S. at 570.

"To cross the plausibility threshold a claim does not need to be probable, but it must give

rise to more than a mere possibility of liability."  Grajales, 682F.3d at 44–45 (citing Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009)).  "A determination of plausibility is 'a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense.'"  Id. at 44

(quoting Iqbal, 556 U.S. at 679).  "[T]he complaint should be read as a whole, not parsed piece

by piece to determine whether each allegation, in isolation, is plausible."  Hernandez-Cuevas v.

Taylor, 723 F.3d 91, 103 (1st Cir. 2013) (quoting Ocasio-Hernández v. Fortuño-Burset, 640 F.3d

1, 14 (1st Cir. 2011)).  "The plausibility standard invites a two-step pavane."  A.G. ex rel.

Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (citing Grajales, 682 F.3d at 45).  First, the Court "must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)."  Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)).  Second, the Court "must determine whether the remaining factual content allows a 'reasonable inference that the defendant is liable for the misconduct alleged.'"  Id. (quoting Morales-Cruz, 676 F.3d at 224).

When reviewing a motion to dismiss, the Court may consider documents outside of the pleadings, "'the authenticity of which are not disputed by the parties,' making narrow exceptions to the general rule 'for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.'"  Álvarez-Maurás v. Banco Popular of P.R., 919 F.3d 617, 622–23 (1st Cir. 2019) (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).

## III.   DISCUSSION

The TCA aims to develop wireless infrastructure by removing regulatory barriers that restrict service providers at every level of state government.  Telecommunications Act of 1996, 110 Stat. 56.  Specifically, the TCA limits local authorities through five provisions:

> [L]ocal governments may not 'unreasonably discriminate among providers of functionally equivalent services,' 47 U.S.C. § 332(c)(7)(B)(i)(I), take actions that 'prohibit or have the effect of prohibiting the provision of personal wireless services,' § 332(c)(7)(B)(i)(II), or limit the placement of wireless facilities 'on the basis of the environmental effects of radio frequency emissions,' § 332(c)(7)(B)(iv).  They must act on requests for authorization to locate wireless facilities 'within a reasonable period of time,' § 332(c)(7)(B)(ii), and each decision denying such a request must 'be in writing and supported by substantial evidence contained in a written record,' § 332(c)(7)(B)(iii).

City of Rancho Palos Verdes v. Abrams, 544 U.S. 113, 115–16 (2005).[2]  "Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with" these limitations  "may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction."  47 U.S.C. § 332(c)(7)(B)(v).

### A.      Timeliness Under 47 U.S.C. § 332(c)(7)(B)(ii)

ExteNet first argues that Defendants violated the "shot clock" provisions of the 2018 Declaratory Order by denying its applications as incomplete, [Am. Compl. ¶¶ 95–112], and requests an order granting its applications, [id. ¶ 113.  Defendants argue that there is no requirement that a local authority notify an applicant that its application is incomplete and further that ExteNet conflates incompleteness in filling out a necessary form with a substantive failure to support an application.  [ECF No. 36 at 13–14].

Given the ambiguities within the TCA, the FCC has issued several declaratory orders, including defining "a reasonable period of time" for a decision under § 332.  The first of these orders implemented timing provisions called "shot clocks."  In Re Petition for Declaratory Ruling to Clarify Provisions of Section 332(c)(7)(B) to Ensure Timely Siting Review and to Preempt Under Section 253 State and Local Ordinances that Classify All Wireless Siting Proposals as Requiring a Variance, WT 08-165, FCC 09-99, ¶¶ 1, 13 (Nov 18, 2009) ("2009 Declaratory Ruling").  The Supreme Court explicitly affirmed the FCC's authority to interpret

---

[2] "Personal wireless service facilities are defined in Section 332(c)(7)(C)(ii) as 'facilities for the provision of personal wireless services,' and personal wireless services are defined in Section 332(c)(7)(C)(i) as 'commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services.'"  In Re Petition for Declaratory Ruling to Clarify Provisions of Section 332(c)(7)(B) to Ensure Timely Siting Review and to Preempt Under Section 253 State and Local Ordinances that Classify All Wireless Siting Proposals as Requiring a Variance, WT 08-165, FCC 09-99, ¶ 6 (Nov 18, 2009) ("2009 Declaratory Ruling"), aff'd, City of Arlington v. FCC, 668 F.3d 229 (5th Cir. 2012), aff'd, 569 U.S. 290 (2013).

ambiguities within the TCA and to establish these shot clocks in <u>City of Arlington v. FCC</u>, 569 U.S. 290 (2013).  Failing to act within an applicable shot clock creates a presumption that the authority failed to act within a reasonable period of time, resulting in an effective prohibition of the provision of wireless services under § 332(c)(7)(B)(i)(II).  <u>In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment; Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment</u>, WT 17-29, WC 17-84, FCC 18-133, ¶ 37 (Sept. 26, 2018) ("2018 Declaratory Order"); <u>see also</u> <u>City of Portland v. United States</u>, – F.3d –, 2020 WL 4669906, at *13 (9th Cir. Aug. 12, 2020) (finding that, although the shortened shot clocks for wireless facilities were reasonable, the FCC did not adopt a "deemed granted remedy for shot clock violations," such that an untimely decision would automatically result in the application being granted).

For Small Wireless Facilities, the relevant shot clocks are sixty days for collocation, which utilize existing infrastructure, and ninety days for other applications, which require new construction, unless the parties agree to toll the shot clocks.[3]  2018 Declaratory Order ¶¶ 105– 112, 131; <u>see also</u> <u>City of Portland</u>, 2020 WL 4669906, at *6 ("State and local governments now have sixty days to decide applications for installations on existing infrastructure, and ninety days for all other applications.  The Order does not add enforcement mechanisms.  If a state or local government misses a permitting deadline, the applicant must still seek an injunction.").  Local authorities may also toll these shot clocks by providing notice to the applicant that their

---

[3] Collocations add further wireless capabilities by utilizing existing infrastructure.  2009 Declaratory Ruling ¶ 45.  Non-collocations entail new construction or "substantial[ly] increas[ing] . . . the size of a [cellphone] tower."  2009 Declaratory Ruling ¶ 46.

application is incomplete within ten days of receiving the application.  2018 Declaratory Order ¶ 143.

FCC guidance does not explicitly discuss the denial of incomplete applications.  See generally 2018 Declaratory Order; Acceleration of Broadband Deployment by Improving Wireless Facilities Siting Policies, Report & Order, 29 FCC Rcd. 12865, 12966, 12973 (2014) ("2014 Wireless Infrastructure Order"), aff'd, Montgomery County v. FCC, 811 F.3d 121 (4th Cir. 2015); 2009 Declaratory Ruling.  The FCC has also not clarified what a "complete" application involves, noting that local authorities are better suited for this task.  2014 Wireless Infrastructure Order ¶ 261.  "[A]dversely affected parties" may commence actions where failures to act or final determinations are at odds with the provisions that limit local authorities' decision-making powers regarding telecommunications.  47 U.S.C. § 332(c)(7)(B)(v).

Typically, a local zoning board's decision constitutes a final determination on an application relative to the TCA.  See Omnipoint Holdings, Inc. v. City of Cranston, 586 F.3d 38, 47 (1st Cir. 2009) (affirming district court's finding that the zoning board's decision was a "final action" under § 332(c)(7)(B)(v) because it had concluded its decision-making process).  The parties do not contest that Defendants' denials were a final action.  [Am. Compl. ¶ 109; ECF No. 17-7 at 2 ("Attached is the Commission's written final decision with respect to the petition.")].

Here, ExteNet's applications concerned Small Wireless Facilities and were therefore subject to the FCC shot clocks of sixty days for collocations and ninety days for other applications.  2018 Declaratory Order ¶¶ 105–12.  Because ExteNet sought to remove the existing streetlight poles in favor of its own structures, the clock was ninety days.  2009 Declaratory Ruling ¶ 46.  ExteNet submitted its applications on April 3 and 4, 2019, and Defendants denied them on July 30, 2019, 117 and 118 days after ExteNet's submissions,

respectively.  [Am. Compl. ¶ 87].  Although this would have otherwise been a shot clock violation, 2018 Declaratory Order ¶¶ 105–12, Defendants and ExteNet had agreed to toll the shot clocks until July 30, 2019, [Am. Compl. ¶ 63].  In light of the tolling agreement, the Defendants' final determination is not presumed to be a failure to act within a reasonable time in violation of 47 U.S.C. § 332(c)(7)(B)(ii).  Nevertheless, ExteNet argues that Defendants' final decisions were untimely because Defendants' decisions were based on the alleged incompleteness of the applications, and Defendants failed to notify ExteNet of said incompleteness within the ten-day period provided by FCC guidance.  See [Am. Compl. ¶¶ 95–113].

The provisions outlined by 47 C.F.R. § 1.6003(d)(1) codify the FCC's guidance on how local authorities may toll a shot clock if an application is incomplete.  47 C.F.R. § 1.6003(d)(1); 2018 Declaratory Order ¶¶ 138–39.  Assuming without deciding that Defendants have denied ExteNet applications for incompleteness, ExteNet has cited no authority suggesting that denying an application based on incompleteness is a shot clock violation.  See generally [Am. Compl. ¶¶ 95–113].  The failure to notify an applicant of incompleteness within ten days merely waives the local authority's ability to toll the shot clocks, absent a mutual tolling agreement with the party.  2018 Declaratory Order ¶¶ 141–47.  In this case, the parties agreed to toll the shot clock. [Am. Compl. ¶ 63].  Therefore, the denials were not untimely.

**B.**    **Plaintiff Fails to State a Claim Under All Relevant Effective Prohibition Standards for §§ 332, 253, and as a Facial Challenge to the Small Cell Wireless Policy**

Many of ExteNet's claims center on whether Defendants' denials effectively prohibit the provision of personal wireless services.  Although there are differing standards across the federal courts and across the relevant regulations, the Court finds that ExteNet fails to state a claim under any of these standards.

As a preliminary matter, Defendants argue that ExteNet lacks standing to challenge the denial of its application as an effective prohibition because it does not provide personal wireless services, but instead contracts with companies that provide such services.  [ECF No. 36 at 14]. Under the TCA, "[a]ny person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction."  47 U.S.C. § 332(c)(7)(B)(v).  "The TCA explains that the term 'person' includes an 'individual, partnership, association, joint-stock company, trust, or corporation.'" Liberty Towers, LLC v. Zoning Hearing Bd. of Twp. Lower Makefield, 748 F. Supp. 2d 437, 442 (E.D. Pa. 2010) (quoting 47 U.S.C. § 153(32)).

Here, because ExteNet is a corporation that was adversely affected, [Am. Compl. ¶ 27], it may challenge the Defendants' denial of its applications, Liberty Towers, 748 F. Supp. 2d at 442 (finding that a company that constructed and operated wireless facilities, but was not a telecommunications carrier or service provider, could bring an effective prohibition claim under the TCA); see also VWI Towers, LLC v. Town of N. Andover Planning Bd., 404 F. Supp. 3d 456, 470 (D. Mass. 2019) (finding cell phone tower construction company that leased space to wireless services providers could bring a claim for effective prohibition of personal wireless services under § 332(c)(7)(B)(i)(II)).

       1.    <u>Under Either the FCC's 2018 Declaratory Order Standard, or the First Circuit's "Significant Coverage Gap" Standard, ExteNet Fails To State a Claim for Relief for a Prohibition of the Provision of Personal Wireless Services in Violation of U.S.C. § 332(c)(7)(B)(i)(II)</u>

ExteNet argues that, as an installer of personal wireless service facilities, it has a right under the TCA to install these facilities regardless of whether the facilities would be able to provide wireless services.  [Am. Compl. ¶ 121].  It argues that because neither the definition of

personal wireless facilities nor personal wireless services explicitly mentions power access, its rights under TCA have been infringed by the Defendants' denying its applications based on the lack of power connection for the facilities.  [Id. ¶¶ 125, 127].

First Circuit precedent and the FCC's 2018 Declaratory Order offer different guidance on how to determine whether a local authority's decision constitutes an effective prohibition of the provision of personal wireless services under 47 U.S.C. § 332(c)(7)(B)(i)(II).  Here, because Count II fails both under the First Circuit's "significant gap" test and the 2018 Declaratory Order's California Payphone test, this Court declines to decide which is the more appropriate standard.  See VWI Towers, 404 F. Supp. 3d at 468 ("Because the Court finds that [Plaintiff] has established an effective prohibition even under the First Circuit's more demanding 'significant gap' test, it declines to decide whether the appropriate standard under the TCA is the FCC-endorsed 'materially inhibit' test."); see also T-Mobile Northeast LLC v. Town of Barnstable, No. 19-cv-10982, 2020 WL 3270878, at *7 (D. Mass. June 17, 2020) ("Although T-Mobile urges this Court to adopt the standard discussed in the FCC's September 2018 Declaratory Ruling, this Court, having determined that the First Circuit's test has been met, declines to resolve the applicability of the FCC standard at this time.").

a.      The First Circuit's "Significant Gap" Test

In the First Circuit, determining whether an effective prohibition has occurred under 47 U.S.C. § 332(c)(7)(B)(i)(II) involves a two-step process.  First, the Court determines whether there is a "significant gap in coverage."  VWI Towers, 404 F. Supp. 3d at 467 (internal quotation marks omitted) (quoting Green Mountain Realty Corp. v. Leonard, 688 F.3d 40, 57 (1st Cir. 2012)).  In assessing the alleged coverage gap, courts consider: "1) the 'physical size of the gap', 2) 'the area in which there is a gap', 3) 'the number of users the gap affects', 4) 'whether all of the carrier's users in that area are similarly affected by the gaps' and 5) 'data about percentages

of unsuccessful calls or inadequate service during calls in the gap area.'" Id. (quoting Omnipoint Holdings, 586 F.3d at 49).  Second, the Court considers whether there are feasible alternative options to a wireless service provider's proposal, such that no effective prohibition exists.  Id. at 467 (citing Green Mountain, 688 F.3d at 57).  To satisfy the second step, a plaintiff must demonstrate that "further reasonable efforts are so likely to be fruitless that it is a waste of time even to try.'"  Id. (quoting Green Mountain, 688 F.3d at 57).  In effect, plaintiff needs to establish that other viable facility locations would be insufficient to provide coverage.  See Cellco Partnership v. Town of Leicester, Mass., No. 16-cv-10693, 2017 WL 4381673, at *2 (D. Mass. Sept. 29, 2017) (citing Omnipoint Holdings, 586 F.3d at 48).

The burden is on ExteNet to establish that there has been an effective prohibition of personal wireless services.  See id.  In both steps of this process, the district court reviews the local authority's decision de novo.  See VWI Towers, 404 F. Supp. 3d at 467 (citing Indus. Tower & Wireless, LLC v. Haddad, 109 F. Supp. 3d 284, 303–04 (D. Mass. 2015)).

Here, ExteNet fails to plead facts sufficient to establish a significant coverage gap.  See id. at 466–67 (finding that a significant coverage gap existed where 2,000 new residents would be served by new facilities and the area had over 12,000 vehicles passing through each day). ExteNet alleges that its contract with AT&T was to "provide coverage and enhanced capacity" to AT&T's wireless network, [Am. Compl. ¶ 42], and that "Defendants' denial of ExteNet's Applications materially inhibits [AT&T's] provision of coverage and enhanced capacity within AT&T's network of personal wireless services in Cambridge," [id.¶ 127].  Beyond these general references to coverage, however, there is no mention of any type of coverage gap.  See generally [id.].  In fact, ExteNet's applications were denied in part because they failed to comply with the Small Cell Wireless Policy, which required that applications include "evidence that the proposed

Installation is needed to prevent a material inhibition of wireless services."  [Id. ¶¶ 70, 143

(quoting Small Cell Wireless Policy)].  Where ExteNet's complaint and its original applications

fail to show the existence of a coverage gap, it is impossible to infer that the denial of ExteNet's

applications has the effect of prohibiting the provision of wireless services.  See VWI Towers,

404 F. Supp. 3d at 466–67.

Because ExteNet has not pled facts to establish a significant coverage gap at step one, the

Court need not consider any alternative siting options at step two.  In the interest of a more

complete record, however, the Court briefly addresses the issue.  The Complaint makes no

mention of the consideration of alternative sites, nor does the briefing between the two parties

suggest that alternative sites were considered.  See generally [Am. Compl.; ECF No. 36; ECF

No. 37].  ExteNet has thus failed to show that alternative sites have been considered, or to even

acknowledge that considering them was necessary.  See VWI Towers, 404 F. Supp. 3d at 468–69

(finding that a plaintiff met burden of showing that alternative sites were considered by

submitting letters showing lack of willingness to lease alternative sites or otherwise documenting

the infeasibility of defendant-town's proposed alternative sites).  Because ExteNet has not pled

any facts concerning the alleged feasibility of other locations, the Court is unable determine "that

further reasonable efforts are so likely to be fruitless that it is a waste of time even to try."  Id. at

466–67 (quoting Green Mountain, 688 F.3d at 57).  Thus, per First Circuit precedent, ExteNet

has failed to carry its burden to state a plausible claim under § 332(c)(7)(B)(i)(II).

b.     The FCC's 2018 Declaratory Order Standard

The FCC expressly rejected the First Circuit's "significant coverage gap" test in its 2018

Declaratory Order.  2018 Declaratory Order ¶ 40 n.94 ("[W]e reject . . . the 'coverage gap' test

followed by the First, Fourth, and Seventh Circuits (requiring applicants to show 'not just that

14

this application has been rejected but that further reasonable efforts to find another solution are

so likely to be fruitless that it is a waste of time even to try').").  Instead, according to the FCC,

> effective prohibition occurs where a state or local legal requirement materially
> inhibits a provider's ability to engage in any of a variety of activities related to its
> provision of a covered service.  This test is met not only when filling a coverage
> gap but also when densifying a wireless network, introducing new services or
> otherwise improving service capabilities. . . .  [A] state or local legal requirement
> could materially inhibit service in numerous ways . . . [including] by materially
> inhibiting the introduction of new services or the improvement of existing services.

2018 Declaratory Order ¶ 37.

Here, the P&C Commission denied ExteNet's applications based on a number of local

policy violations, but principally because ExteNet did not provide adequate information for how

the facilities in question would receive both power and data.  [Am. Compl. ¶¶ 90–92].

According to the P&C Commission, allowing the placement of facilities without assuring that

these facilities had access to power, or that the company who had contracted for the facilities'

construction would in actuality use them, would impede the provision of future personal wireless

services.  [ECF No. 17-7 at 5 (noting that allowing facilities to be installed without provisions

guaranteeing their use and power would result in unfair competition because companies would

"reserve" space without providing actual services)].

ExteNet has failed to establish how requiring applicants to show how their facilities

would be powered "materially inhibits or limits the ability of any competitor or potential

competitor to compete in a fair and balanced legal and regulatory environment in the [given]

market. . . ."  In the Matter of California Payphone Ass'n Petition for Preemption of Ordinance

No. 576 Ns of the City of Huntington Park, Cal. Pursuant to Section 253(d) of the Commc'ns

Act of 1934, 12 FCC Rcd. 14191, 14210 (1997) ("California Payphone").  Instead, as reasoned

by Defendants, such a policy encourages a "fair and balanced legal and regulatory environment,"

id., by preventing unfair reservation of limited public way space for Small Wireless Facilities

that do not in fact provide personal wireless services, see, e.g., [ECF No. 17-7 (explaining

reasons for denial)].

Further, although ExteNet claims that Defendants have violated its rights under the TCA,

[Am. Compl. ¶¶ 114–28], it does not allege facts that show how Defendants' policies "materially

inhibit[] or limit[] the ability of any competitor or potential competitor to compete in a fair and

balanced legal and regulatory environment in the [given] market." California Payphone, 12 FCC

Rcd. at 14210.  Plaintiff has therefore not met its burden of pleading facts sufficient to state a

plausible claim of effective prohibition under § 332(c)(7)(B)(i)(II).

Thus, because Plaintiff has failed to state a claim that satisfies either the FCC or First

Circuit standards for effective prohibition under § 332, Count II must be dismissed.

> 2.     ExteNet Fails to Allege How Defendants' Actions Would Materially
>        Inhibit the Provision of Telecommunication Services Under § 253(a)

Next, ExteNet argues that Defendants have materially inhibited its ability to provide

wireless telecommunication services by requiring information that is not in its possession and

also by requiring it to coordinate with AT&T during the application process.  See [Am. Compl.

¶¶ 133–34; ECF No. 37 at 18].  As with effective prohibition under § 332, Defendants argue that

the denials cannot inhibit the provision of wireless services because ExteNet does not provide

these services and the facilities in question are not capable of providing these services.  [ECF No.

36 at 14–16].

Section 253(a) of the TCA provides:

**(a) In general**
No State or local statute or regulation, or other State or local legal requirement, may
prohibit or have the effect of prohibiting the ability of any entity to provide any
interstate or intrastate telecommunications service.

**(b) State regulatory authority**
Nothing in this section shall affect the ability of a State to impose, on a
competitively neutral basis and consistent with section 254 of this title,

requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

**(c) State and local government authority**
Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

47 U.S.C. § 253(a)–(c).  "[I]n determining whether an ordinance has the effect of prohibiting the provision of telecommunications services, [the FCC] considers whether the ordinance materially inhibits or limits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment."  P.R. Tel. Co. v. Mun. of Guayanilla, 450 F.3d 9, 18 (1st Cir. 2006) (internal quotation marks and citations omitted) (quoting TCG N.Y., Inc. v. City of White Plains, 305 F.3d 67, 76 (2d Cir. 2002)) (finding plaintiff using public rights of way for telephone business had met this standard where a local ordinance might have reduced plaintiff's profits by 86% through new leasing fees).

In the First Circuit, a plaintiff may meet its burden of demonstrating that a regulation effectively prohibits its ability to provide wireless services by showing the mere possibility of an effective prohibition, rather than by showing an actual effective prohibition.  Id. (finding that plaintiff had met their burden of showing an effective prohibition under § 253(a) by providing analysis of what would happen if every municipality adopted the ordinance in question, even though only the municipality in the suit had adopted the ordinance).  But see Level 3 Comm'ns, L.L.C. v. City of St. Louis, 477 F.3d 528, 533 (8th Cir. 2007) (disagreeing with the First Circuit's reasoning that a mere possibility of effective prohibition is enough to satisfy plaintiff's burden under § 253(a)).

A plaintiff has the initial burden of showing that a local authority's action may constitute an effective prohibition under § 253.  Guayanilla, 450 F.3d at 21.  The burden then shifts to the defendant to show that the provision in question protects public safety, ensures quality universal service, protects the rights of consumers, or is an exercise of a local authority's right to manage public rights of way and receive compensation for their use.  See id.

Because ExteNet does not allege facts, beyond its conclusory allegation that Defendants' actions prohibit it from providing telecommunications services,  that allow the inference that Defendants' actions "materially inhibit[] or limit[] the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment," ExteNet has failed to state a claim under § 253(a).  See id. at 18.  In fact, ExteNet is already coordinating with AT&T to provide wireless services, [Am. Compl. ¶ 41], which suggests that the requirement that the Small Wireless Facilities at issue be powered is not materially inhibiting its ability to compete.  Thus, because ExteNet has failed to plead that requiring Small Wireless Facilities to be powered is inhibiting its ability to compete, Count III must be dismissed.  Insofar as ExteNet believes that it has been discriminated against, that claim is considered separately, below.

### 3.    ExteNet's Facial Challenge Fails

ExteNet next brings a facial challenge against the Defendants' Small Cell Wireless Policy.  As an initial matter, the parties dispute whether the newly adopted Small Cell Wireless Policy should apply to ExteNet's applications, and further, whether Defendants adopted such a policy within the FCC's preferred time frames.  ExteNet argues that Massachusetts law disfavors the retroactive application of new laws, and therefore the Small Cell Wireless Policy should not apply to its applications.  [ECF No. 37 at 19 (relying on Sentry Fed. Sav. Bank v. Co-operative Cent. Bank, 548 N.E.2d 854 (Mass. 1990)].  ExteNet also avers that Defendants did not adopt their Small Cell Wireless Policy within the FCC's anticipated timeframe.  [Am. Compl. ¶¶ 137–

41].  Defendants claim that the denials were based on policies in effect before ExteNet submitted

its applications, and that the FCC timeframe referenced by ExteNet is for aesthetic standards

only.  [ECF No. 36 at 17–18].  Given that the denial was not based on aesthetic standards, and

that Plaintiff had many opportunities to conform its applications to the Small Cell Wireless

Policy, Defendants argue that ExteNet's timing contentions are misplaced.  [Id.].

"Unless the legislative intent is unequivocally clear to the contrary, a statute operates

prospectively, not retroactively."  Sentry Fed. Sav. Bank, 548 N.E.2d at 856 (finding that an

amendment to a statute governing the conversion of federal savings banks to cooperative banks

should not apply retroactively to banks who converted one and two years prior to the adoption of

the amendment).  Here, the parties tolled the shot clocks for the purpose of developing a Small

Cell Wireless Policy that would apply to ExteNet's applications.  [Am. Compl. ¶¶ 61–64].

ExteNet submitted numerous comments and advocated for changes to the policy in public

hearings.  [Id. ¶¶ 65–70].  Given that Defendants' clear intent was to apply the Small Cell

Wireless Policy to ExteNet's applications and that ExteNet played a role in shaping those

policies, ExteNet's contentions regarding the timing of the policy are without merit.  See Sentry

Fed. Sav. Bank, 548 N.E.2d at 856.

Defendants' Small Cell Wireless Policy also does not violate any FCC timing provisions

because the FCC provisions referenced by ExteNet only pertain to aesthetic considerations.

With regard to the FCC's anticipated time frame for adopting aesthetic standards, the FCC stated

that

> to establish that [such policies] are reasonable and reasonably directed to avoiding
> *aesthetic* harms, *aesthetic* requirements must be objective—i.e., they must
> incorporate clearly-defined and ascertainable standards, applied in a principled
> manner—and must be published in advance.  'Secret' rules that require applicants
> to guess at what types of deployments will pass *aesthetic* muster substantially
> increase providers' costs without providing any public benefit or addressing any

public harm.  Providers cannot design or implement rational plans for deploying Small Wireless Facilities if they cannot predict in advance what *aesthetic* requirements they will be obligated to satisfy to obtain permission to deploy a facility at any given site.

[Am. Compl. ¶ 139 (emphasis added) (citing 2018 Declaratory Order)].  Here, the Small Cell Wireless Policy governs the placement of Small Cell Wireless facilities.  [ECF No. 17-12 (Small Cell Wireless Policy)].  ExteNet does not allege, nor does it appear, that any of the reasons given for denial or that any of the provisions within the Small Cell Wireless Policy concern primarily aesthetic requirements.  See generally [Am. Compl.; ECF No. 37].  ExteNet's arguments that the adoption of the Small Cell Wireless Policy was untimely are therefore without merit.

ExteNet next argues that, even if the Small Cell Wireless Policy was timely, it is preempted in whole or in part because it discriminates against wireless service companies as compared to other telecommunications services companies.  [Am. Compl. ¶ 142].  ExteNet asserts that the Small Cell Wireless Policy requires information that would be available to personal wireless services providers, like AT&T in this case, but not neutral host providers, like ExteNet.  [ECF No. 37 at 20–21].  Defendants respond that ExteNet has merely listed portions of the Small Cell Wireless Policy that it finds objectionable without showing how these provisions discriminate against ExteNet or effectively prohibit the provision of personal wireless services.  [ECF No. 36 at 19–21].

"A facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."  United States v. Salerno, 481 U.S. 739, 745 (1987).  Because the Small Cell Wireless Policy is not an outright ban on the provision of personal wireless services, the validity of the Policy hinges on "whether the [Policy] effectively prohibits the provision of wireless services."  Sprint Tel. PCS, L.P. v. County of San Diego, 543 F.3d 571, 579 (9th Cir.

2008) (finding that Sprint's facial challenge to San Diego ordinance that regulated the placement of small wireless facilities failed to show that no set of circumstances existed under which the regulations would be valid).  ExteNet argues for preemption under § 253.  Under this section, an effective prohibition is one that "materially inhibits or limits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment."  Guayanilla, 450 F.3d at 18.

Here, ExteNet fails to show that, in all circumstances, the Small Cell Wireless Policy materially inhibits or limits the ability of any competitor to compete in a fair regulatory environment.  Without citing any authority, ExteNet alleges that the Small Cell Wireless Policy effectively prohibits the provision of personal wireless services by forcing joint applications between neutral host and personal wireless service providers.  [ECF No. 37 at 20–21].  ExteNet claims that, in many cases, information required by the Small Cell Wireless Policy may be available to the personal wireless service providers but would not be available to neutral host providers.  [Id.].  Thus, ExteNet concludes that requiring this information "effectively prohibit[s] the provision of wireless services by . . . neutral host providers of small wireless facilities."  [Id. at 22].

The argument is misguided.  Because a wireless facility could not function without power and data, requiring information concerning that power and data is not an effective prohibition of the provision of wireless services.  See Guayanilla, 450 F.3d at 18.  Further, ExteNet has not alleged that forcing joint applications would, in all circumstances, "materially inhibit[] or limit[] the ability of any competitor . . . to compete in a fair and balanced legal and regulatory environment."  Id.; [ECF No. 37 at 19–21].  Because ExteNet fails to show how the Small Cell Wireless Policy could plausibly be invalid in all circumstances, it fails to meet the standard for a

successful facial challenge to the Small Cell Wireless Policy.  Therefore, Count IV must be dismissed.

### C.  ExteNet Fails to State a Claim for Unreasonable Discrimination Under 47 U.S.C. § 332(c)(7)(B)(i)(I)

Although not included as a distinct Count within the Complaint, ExteNet alleges that Defendants have violated the "unreasonable discrimination" provision of the TCA.  [Am. Compl. ¶¶ 123–24].  This provision states that local authorities' regulations "shall not unreasonably discriminate among providers of functionally equivalent services."  47 U.S.C. § 332(c)(7)(B)(i)(I).  ExteNet asserts that Defendants "unreasonably discriminat[ed] among providers of functionally equivalent services" by forcing ExteNet to coordinate with AT&T to install the Small Wireless Facilities at issue.  [Am. Compl. ¶¶ 123–24].[4]

Though there is little First Circuit precedent on how to interpret unreasonable discrimination claims under the TCA, courts have largely analyzed discrimination claims in a manner consistent with the test in the Third Circuit.  See Varsity Wireless, LLC v. Town of Boxford, No. 15-cv-11833, 2018 WL 3970677, at *23 (D. Mass. June 29, 2018) ("To establish unreasonable discrimination under the TCA, the provider must show that its proposal was treated differently than wireless facilities [that were given a permit] that are similarly situated in terms of structure, placement, or cumulative impact."); New Cingular Wireless PCS LLC v. Town of Stow, Mass., No. 06-cv-10659, 2009 WL 2018450, at *4 (D. Mass. July 9, 2009) ("The TCA's unreasonable discrimination provision has not yet been interpreted by the First Circuit, but courts

---

[4] ExteNet further claims that the application process risks releasing its "confidential and proprietary plans."  [Am. Compl. ¶¶ 123–24].  ExteNet has cited no authority for the proposition that § 332(c)(7)(B)(i)(I) protects confidentiality or guards against the exposure of plans, nor has it specified what confidentiality concerns there are given the public nature of its applications and its contract with AT&T.  See [id.].  The Court therefore focuses its analysis on unreasonable discrimination claims under TCA.

have generally held that it does not prevent towns from discriminating based on traditional

zoning concerns that distinguish a proposed facility from an existing one."); Sprint Spectrum

L.P. v. Town of Easton, 982 F. Supp. 47, 50–52 (D. Mass. 1997) (stating that the unreasonable

discrimination provision of the TCA indicates that Congress wanted local authorities to consider

how their zoning decisions affect telecommunications).  The Third Circuit utilizes a two-part test

to analyze unreasonable discrimination claims under the TCA: "First, the plaintiff must show

that the relevant providers are functionally equivalent.  Second, the plaintiff must show that the

government body unreasonably discriminated."  Nextel West Corp. v. Town of Edgewood,

N.M., 479 F. Supp. 2d 1219, 1229 (D.N.M. 2006) (quoting Omnipoint Commc'ns Enters., L.P.

v. Zoning Hearing Bd. of Easttown Twp., 331 F.3d 386, 395 (3d Cir. 2003)).

The purpose of the unreasonable discrimination provision is "to ensure that, once the

municipality allows the first wireless provider to enter, the municipality will not unreasonably

exclude subsequent providers who similarly wish to enter and create a competitive market in

telecommunications services."  Town of Edgewood, 479 F. Supp. 2d at 1229 (quoting Nextel

West Corp. v. Unity Twp., 282 F.3d 257, 264 n.6 (3d Cir. 2002)).  The standard focuses on the

unreasonable exclusion of an individual service provider, rather than exclusion generally.  Unity

Twp., 282 F. 3d at 266.

ExteNet has not shown that there is a competing provider who is its functional equivalent

or that Defendants have unreasonably discriminated.  First, ExteNet fails to allege that similar

service providers have been allowed to build unpowered Small Wireless Facilities.  ExteNet

"builds, owns, and operates wholesale, neutral-host distributed network facilities that improve

the coverage and capacity of existing and new wireless networks."  [Am. Compl. ¶ 30].  AT&T

is a personal wireless service provider that pays ExteNet to use its facilities.  [Id. ¶ 32].  Because,

by ExteNet's own admission, AT&T and ExteNet are not functionally equivalent providers, [id. ¶¶ 30, 32, 41], ExteNet fails to state a claim for unreasonable discrimination under the TCA by claiming that the Defendants would allow an application from AT&T, but not from ExteNet, see Sprint Spectrum L.P., 982 F. Supp. at 50–52 (finding that the Town of Easton improperly discriminated against Sprint when it denied Sprint's application for a cell tower that was similar to a tower already permitted by the town).

Second, ExteNet does not specify how Defendants have discriminated against it, nor does ExteNet allege facts showing such discrimination, if any, to be unreasonable.  A typical claim of discrimination under § 332(c)(7)(B)(i)(I) alleges that a municipality has denied the plaintiff's application while permitting other providers to collocate to the same cell tower or construct a facility in a similar area.  See Town of Edgewood, 479 F. Supp. 2d at 1232–33 (finding that a town council unreasonably discriminated when it denied adding new antennae to a tower, but allowed existing antennae to remain, when there was no evidence to suggest that the additional antennae would exacerbate any safety concerns).  Here, Defendants did not deny ExteNet's applications in favor of a different party whose applications were substantially the same as ExteNet's, but rather denied the applications because there was no evidence that the facilities could be powered or provide data.  See, e.g., [ECF No. 17-7 (explaining reasons for denial)]. Thus, ExteNet has failed to state a claim that it was unreasonably discriminated against.

### D.   The Court Need Not Consider the Appropriate Remedies.

Because ExteNet has failed to state a claim under Counts I, II, III, and IV, the Court need not consider remedies under Count V.

**IV.      CONCLUSION**

Accordingly, because ExteNet has failed to state a claim that Defendants' denials of its

applications violated any provision of the TCA, Defendants' motion to dismiss, [ECF No. 35], is

GRANTED.

**SO ORDERED.**

August 26, 2020                                                        /s/ Allison D. Burroughs
                                                                        ALLISON D. BURROUGHS
                                                                        U.S. DISTRICT JUDGE